The next matter, number 24-1279, Brian Hussey v. City of Cambridge et al. At this time, would counsel to the appellant please introduce himself on the record to begin. Thank you, and may it please the court, my name is Jack Bartholet, and I have the honor of representing the plaintiff appellant in this matter, Sergeant Brian Hussey. Judge, I'll be with the court's permission, I'd like to reserve two minutes for rebuttal. Okay, you have two minutes. Thank you. My client, a 26-year veteran of the Cambridge Police Department, believed it was inappropriate to name an important and needed federal police reform bill after someone with such an extensive criminal record rather than the type of hero such bills are usually named after. As he told his superiors from day one, he was horrified by what happened to Mr. George Floyd and maintained that the officers involved in his murder should be fully prosecuted. Officer Hussey simply believed naming the bill after Mr. Floyd was inappropriate, and he expressed that on his private Facebook page. But because the police commissioner personally disagreed with the viewpoint of Officer Hussey's political message when it was brought to his attention by several community members, and despite there being absolutely no evidence of disruption caused by the post, which was up for less than three hours, restricted to Facebook friends Hussey personally knew, and posted using Hussey's personal cell phone while he was off duty and at home, Commissioner Bard first placed Officer Hussey on administrative leave for several months without overtime or detail opportunities, during which there was still no disruption, and then suspended him for four days after an investigation that consisted entirely of interviewing solely Officer Hussey one time. Counsel, you say this was a private communication. How can this be private? I mean, once it's out there, you lose control over it. And this case demonstrates the way in which one loses control. Somebody took a snapshot of it, and it's communicated to other people. So the notion that this was sort of a private communication, perhaps in the sense that one member of the police department might have made a comment to a fellow member of the police department, that would be private. There's nothing remotely private about this type of communication, is there? Well, there is to some degree. This was a Facebook page that was restricted solely to people he personally knew, his friends. He testified he only accepted friend requests or sent friend requests to people he knew. And so it was a cabined community of roughly 600 or so people. Admittedly, you know, somebody can screenshot that post, but that's always been true in communications like letters. You can always take a letter and show it to somebody else. But more to the point, I mean, the Rankin case, Rankin v. McPherson, suggests that when there's sort of a private environment in which a message is shared, you don't look to the tertiary effects. In that case, for example, right, the constable officer had shared with a coworker a communication. That communication obviously made it to the constable officer's superiors at some point. But it was still, the Supreme Court took pains to say it was still in a private environment. A Facebook page is a private forum for expressing your views. In fact, it's really sort of the modern, you know, soapbox. This is how people express political thought in today's society. And so, you know, it was still in a private, certainly private as distinct from the workplace, which is where a lot of the cases sort of center the analysis. But this was a private communication. And so I'm a little confused by your use of the word private. Are you using private to distinguish from the workplace, or are you saying private because it was a limited audience in your view? Well, I think both. But I think in the case law, it's really distinct from the workplace. So, you know, if it was made in the public employer's workplace, it has a greater propensity to disrupt operations. Here it's made at home, away from the workplace. And so, you know, but I mean the broader point is that you balance the interests under the Pickering test. And even if it wasn't, you know, private in sort of the traditional sense, it was away from the workplace, less likely to cause disruption. But there are a multitude of factors that suggest that this has a heightened interest on Officer Hussey's side and the public side. It was about core political speech. It was about pending federal legislation. That entitles it to the highest rung of First Amendment protection. It additionally concerned the subject matter of Officer Hussey's 26 years of experience, federal police reform. It informed the public on his views on that. Excuse me. In this area of government speech, the way in which you choose to participate in the debate does matter. The language that you use does matter. And the doctrine is that if it's inflammatory, derogatory, other adjectives like that, in the balancing test, it's less deserving of protection. Now your client acknowledged in his dealings with the Cambridge Police Department that the word druggie, he would never use that word if he were actually confronting an individual with a substance abuse problem. He acknowledged that it's inappropriate, that it's demeaning, that it's offensive. So why doesn't his own acknowledgement indicate that he understood that this use of the word druggie was derogatory? It wasn't just a statement of fact, that it wasn't really a derogatory comment that he never would use if actually confronting somebody in person with a substance abuse disorder. So you're right. I would somewhat disagree with sort of the characterization. He said he wouldn't, you know, use it with somebody interacting on the street, for example. But it doesn't make it sort of inherently derogatory. This is a term, and we have a very lengthy footnote that cites several cases. I can tell you that's a twentieth of the size of what it originally was. This is what the report says. In his PSU interview, he acknowledged he never called any of these people suffering from substance use disorder as a druggie to their face, as it would be unprofessional to do so. That's his own characterization, is it not? It is. I think that's true, that it would be unprofessional to somebody's face to call them a druggie if you're dealing with a situation that police typically deal with. I don't think that that makes it inherently derogatory, divisive, you know, all the terms that the courts have used, vulgar, mocking, insulting. I mean, this is sort of standard language. Druggie, in our view, in, you know, the many, many cases and articles and dictionaries and everything we've cited, it is a commonplace term. But more to the point, I mean, to require government employees, which are one in eight of all American workers, to sort of use the most precise scholarly language in their character-limited political posts would tremendously chill public speech for a massive portion of American society. And so, you know, like, the notion that using druggie instead of using the term person suffering from substance use disorder is sort of what this case hinges on, we don't think is a valid constitutional consideration. We do not think that this term, druggie, is inherently vulgar, mocking, derisive, in any of the sense that prior cases have held. And we've distinguished in our briefs the difference between this, you know, the use in this case, and where courts have found the language to be inherently derogatory and divisive. But even setting aside all of that, even if this court views it as inherently mocking and derogatory, it still needs to engage in that balancing test. And so while that might create a greater propensity for disruption, where here there is no disruption, no evidence of disruption, no reasonable predictions of disruption, we don't think that it can overcome the tremendous value that Hussie speech had, both inherent value as the speaker and value to the public. And the Supreme Court and this court has time and time again emphasized. How do you define disruption in the context of this case? Weren't there concerned citizens who brought this to the attention of the police department? So I think that's a good point, Your Honor. Thank you. You're welcome. In this case, the department is defining disruption as likely to offend any member of the community, right? Or they really suggest that it's likely to offend people suffering from substance use disorder and then make them less likely to cooperate with police. And that in and of itself, they say, is disruption to the operations, because they say that that would impact the close working relationships, which is something the Supreme Court and this court have said affects disruption. That is a massive constitutional problem in the sense of allowing a heckler's veto. There's a great litany of political speech that one could give that is going to intrinsically offend a member of society. I support Israel. I support Palestine. We can't shut down all debate from one in eight Americans on topics like that because it would offend some community members. And so when we're dealing with the police department. But, Counsel, aren't you, I mean, the doctrine establishes and the district court relied on the context here. The context was all that happened in this country in the wake of the murder of George Floyd, which involved, that was inescapably a racial event, and it triggered great consternation in minority communities about the way in which he had been treated and other members of the minority community are treated. And that was true in Cambridge. I mean, there were protests about that. So it's the NAACP that stepped forth to express concern about this post. Isn't that particularly significant that it was the NAACP that stepped forth and expressed concern about how this would affect the community that they represent, that they work with, that they know well? And wasn't the police department entitled to be particularly concerned that the NAACP found this so offensive, particularly given the context of what happened in the wake of the murder of George Floyd? No, Your Honor, and a few points in response. The first is that all sides have conceded that this was not a racial comment. It doesn't have racial connotations. And so Commissioner Bard testified to that, and now Commissioner Elo testified to that. The opposing side in their briefings acknowledged this. It didn't have racial connotations. So the NAACP objecting is really just objecting on a viewpoint of they wanted the bill named after Mr. Floyd. They wanted the bill named after Mr. Floyd. Officer Hussey didn't. They can't commandeer the government to sort of censor political speech that they're in opposition to. But, you know, there's also the broader point you brought up, the timing. This was pending legislation. So there is a clock on this that, you know, we can't shut down speech to allow the legislative clock to run its course. That would be very pernicious. But I'm also reminded of Justice Brandeis's concurrence in Whitney. I mean, men feared witches and burnt women. It's the function of free speech to free men from the bondage of rational fears. The heightened political climate is not a basis for shutting down political speech. That's when we need political speech the most. And so, you know, the police department isn't able to just sort of cite that there were protests going on. I also want to say that this speech was a year after the murder of George Floyd. It was like a full year. And so at a certain point, I understand that, you know, the topics being discussed around Mr. Floyd's murder are massively important political discussions. But we don't just allow the fact that they're massively important political discussions to shut down. So, Counsel, you say this is viewpoint discrimination. I gather you're arguing that the concerns expressed by the Cambridge Police Department about disruption in the community, compromising their trust relationship with the community, you see that as really like a pretext. That's not really what's going on here. What is your, other than that assertion, what is your evidence that this is viewpoint discrimination, such that you argue there's a genuine issue of material fact here, and so it should go to the jury? Are you saying that because it was the NAACP that brought these concerns to the attention of the Cambridge Police Department, that's your evidence that this was viewpoint discrimination? No, Your Honor. So some of the cases discussed in this, Michos, which Your Honor wrote, Dabney v. Hodgson, which Judge Howard, you wrote, these deal with sort of that topic of the motivation of the speech. Here, not only do we think the district court's opinion clearly shows that it found the speech offensive because it, quote, you know, failed to honor the sacrifice of George Floyd and demean the reasons, you know, he gave his life up for this police bill, et cetera. It's also that the department has inconsistently treated speech. And so, you know, these are the factors that Dabney says to look at. They, you know, for example, Commissioner Elo had used the term crackhead in public, actually in Central Square around people suffering from substance use disorder. There was no investigation, none. Another thing that the Supreme Court in Waters and against- Well, that was essentially a private conversation, was it not? Well, I mean, there's the record is underdeveloped on that. It was just we know that it was in Central Square and that she said it to Officer Hussey. But more to the point, the Supreme Court in Waters said that the extensiveness or non-extensiveness of the investigation, and they said this in Rankin too, can show the motivation of the employer. Dabney said that with Sheriff Hodgson. He conducted barely any investigation. Here, the investigation never looked at the potential for disruption. It never considered who-the police department still doesn't even know who screenshotted the post. They didn't go try to figure out was this disruptive. And Dabney on Judge Howard's opinion there says pretty clearly that that can show, you know, the motivation of the employer, whether it was motivated by personal opposition to their views or motivated by a real concern for disruption. And here, we think it's really clear that there is a personal disagreement on behalf of Commissioner Bard to this legislation based on the lack of enforcement in other areas of other speech. The district court dismissed all of those supposed comparators. One of them involved a private benevolent association of the police. It wasn't part of the Cambridge Police Department. In another case, there was discipline imposed. So why was the district court wrong to reject all of those? So a couple of things. The first is that, you know, the crackhead remark by Commissioner Elo, it also dismissed. It said all of these had scant details. We think the record has plenty of meat to it on that. In terms of the police benevolent society or unions post, those were Cambridge police officers off duty, much like the officer in this case, Mr. Hussey. And so they didn't investigate those. We think that shows a lack of double standard because the speech was motivated by, you know, what the speech is advocating. In terms of the discipline imposed to the deputy superintendent, it's actually unclear that there was any discipline imposed because Chief Commissioner Bard said he doesn't remember if he actually served the suspension or carried out any of those functions, this being summary judgment that's intended to be, you know, viewing the evidence in the light most favorable to our client. But, you know, the key part of this is that there's a lot, there's enough here that it's a material factual dispute. And so in any event, this court should remand the district court to at least resolve the motivation prong, as it has done in Mijos, which Your Honor wrote, as it has done in Davignon, which Your Honor wrote, as the Supreme Court instructed in Waters v. Churchill. There's enough here. And if I could just close by saying, if this speech is left unprotected by the First Amendment, there is a litany of speech that would allow government employers to simply declare something likely to offend somebody in the community, which in this fraught political climate is highly likely on any issue. The Supreme Court has said that we need to be incredibly vigilant. We need to allow people with expertise in the areas that they're commenting on to be able to be heard by the public. And it's the public's right and Mr. Hussey's right to be able to communicate in this matter. Okay. Thank you, counsel. Let's hear from the public counsel. Counsel from the Appellee's City of Cambridge, please introduce yourself on the record to begin. Good afternoon. Kay Clamola on behalf of the defendant's appellees. And I'd like to pick up where the plaintiff left off with the motivation of the City of Cambridge and the Cambridge Police Department and exactly what the evidence shows. What the evidence shows is that Deputy Superintendent Albert was disciplined for five days for an inappropriate Facebook post or an inappropriate Twitter post that appeared on the department's Twitter page. It also shows that the department has no authority to investigate any social media post posted by one of the Cambridge Police Unions as it's a separate entity and it's protected, quite frankly, by Mass General Law's Chapter 150E. So the Cambridge Police, for a variety of reasons, cannot investigate any social media posts made by a separate organization unless it's undergoing some sort of criminal investigation, which it was not. And again, as to Commissioner Elo's unfortunate comments, the court was right that that was a private conversation. That is the state of the evidence as it is now. The plaintiff himself testified that he was speaking with the commissioner. It was just the two of them. They were at least 10 feet away from any other individuals. No one else overheard the comments. No one else was part of the conversation when she made that comment. You'll see in Commissioner Elo's deposition testimony that she immediately apologized and recognized that she should not have used that term. And no one was informed. The plaintiff was the only individual other than now Commissioner Elo who knew of this comment. And he told no one about it in the city until we were undergoing discovery in this case. So there is really no concern that her comments could have affected the public's trust in the Cambridge Police Department under those circumstances. Counsel, I think the briefing must allude to this. We have this decision that came down in June of 2024, McCrae v. Matos, which I don't think was available to the district court when it wrote its decision here. Now, it does seem to me that in that case there is far, far more evidence of public disruption, if you will, from the comments at issue there than you have in this case. This is a large point that your opponents make, that here the only evidence of disruption is the reaction of the NAACP officials to this Facebook posting. And is that enough to establish the reasonableness of the fear of the Cambridge Police Department that this posting would be disruptive of the trust relationship that the department had worked so hard to promote with both the larger community and the minority community in Cambridge? Because that's really all there is, right? It is the concerns expressed by the NAACP. There's nothing else, right? Well, I would say, you know, as we have learned in all of the Pickering line of cases, context matters here. And the context here was that we were less than a year, I think, about nine months after the murder of George Floyd. The governor, just two and a half months prior, had signed into law the police reform in Massachusetts, creating the Peace Officers Standards and Training Commission, the Post Commission. So this was still an ongoing conversation here in the Commonwealth, and particularly in Cambridge, as the district court found that there were still protests happening both in Cambridge and in the greater Boston area. And this was not, I know Your Honor pointed out, that the murder of George Floyd brought on consternation in the minority communities of how they had been treated by the police, and that's certainly true. But it also brought on a larger conversation of how the police treated everybody, particularly the minority neighborhoods and the minorities, but also how they treated everyone. And that's what the Post, that's why the Post was so concerning to the Cambridge police, because it's expressing through derogatory, disparaging, and mocking language, a viewpoint that could be held against the police department, against some of their most vulnerable constituents. So that is sort of the framework around the police department's concern of disruption. Now what they had come to them are two members of the NAACP, who are a well-known organization to take very seriously bias within policing, and they don't raise concerns that are minor. If the NAACP comes knocking on your door saying we're concerned about bias within your police department, that's something that you should probably take a look at, because they may very well have a valid concern. You also had a community activist, and I'd also want to note that one of the NAACP officers was the former mayor. So we're talking about a community activist within Boston-Cambridge, two NAACP members, one of whom was a former mayor. These are people who know the community. They know what has happened over decades in this community, and they came to the police and to the city and said, we have an urgent concern. We believe that this post is going to affect the trust that the community has within this department. So of course, when they're in this environment, where there is increased scrutiny on the police department, and they have these well-respected, knowledgeable members of the community telling them, this post is going to negatively impact the trust that the community has in your police department, the police were reasonable in the prediction that that would be true. That they acted quickly and they placed Officer Hussey on leave does not mean that there wouldn't have been a disruption or that their prediction was unreasonable because it didn't come to fruition. It just means that they were successful in stemming the tide of any visible disruption to the department. When we're talking about, as I mentioned before, this balancing test, we have learned that context really does matter in every part of the balancing test. So as to that, I'm pinpointing the suspension, which was roughly what, three months after the posting? I think it was about two, two and a half months. Two and a half? Okay. So does that length of time matter in the Pickering balancing? Sure, yes. Time also always matters in the Pickering balancing test. That's why you have the time, place, and manner questions that you need to go through. Here, where we're talking about, he made the post in the end of February, it was brought to the attention of the police department one week later, and he was suspended two months later. This is not a long period of time that we're talking about. We're not talking about something that happened over years. And again, I think you have to place this into the context. If this had been a post that had been made a number of years before, and the department was not in the middle of this reckoning that all police departments across the country were going through, then I think perhaps maybe the two months would have mattered more. But that's not the case here. Here, they were still in the infancy of the new police reform law. That was being discussed quite a bit because it was being implemented as this was happening. So this was very much a conversation that was still live in Cambridge and in the Commonwealth. So no, two months does not make a difference. Counsel, there may be the police reform process, but if this is disruptive and he's there for two and a half months, again, I share Judge Howard's concerns about the Pickering issue. But regardless of the reform, or if there wasn't a reform or the reform was being planned, can't the police department in Cambridge take action with Pickering? It would sort of tend to show it wasn't as disruptive as suggested, and actions being taken so far away to get, in that context, two and a half months. And again, there was only one interview for him. What else? That's my concern. I share Judge Howard's thoughts. Sure, and I can understand that. But I would also note that Officer Hussey was on administrative leave during that two and a half months. So he was not a visible presence in a Cambridge police uniform out in the community. So the impact that he could have, the negative impact that he could have in those two and a half months was severely limited by the police action placing him on administrative leave. And for the police taking two and a half months, that is a fairly standard amount of time for an investigation of this matter to take place. Yes, they did the one interview. They also had to write the report. And I'm sure they had any number of other investigations that were ongoing at the time. So two and a half months for an investigation of this nature is not an unusual amount of time for the Cambridge Police Department. And I would say that in those two and a half months between when this came to their attention and when they implemented the four-day suspension, nothing had changed. The conversations were still going on. Two and a half months from when community members come to you and say, we are concerned about the trust that the community will have on your department because of this post. That's really not any time at all for this to still happen. I think you were right. I think it was two months. But it's two months from the incident. And the community members come in somewhere in the middle. Either the fact that that two-month time period is interrupted, nothing happens before, nothing happens after. Does that matter at all? Especially the before part. Sure. In this case, I don't think it does. Particularly the before part. Because you saw that Officer Hustie was placed on administrative leave. Well, not until the... I mean, that wasn't right away. That was within a week. And it was nearly immediately after it was brought to the attention of the Commissioner. And I would just point the Court's attention to this case. I cited it within my brief. It's Marquette v. Carlton. It's an unpublished Sixth Circuit case from 2023. There was the unfortunate shooting of Tamir Rice. And the captain of the EMTs made a comment, paraphrasing, saying that Mr. Rice got what he had deserved when he was shot by the police, even though he was a child and he was holding what turned out to be a toy. The captain immediately, on that same Facebook page, disavowed his comments. He denied making it. And he continued working and he was not placed on leave. Still, within three days, the NAACP had found it and condemned that Facebook post within a public article in, I think, Cleveland.com or the Cleveland Day or something of that nature. So that's the result when someone is not placed on leave and when action is not taken. And so that's what the Cambridge police were reasonably faced with and what they were reasonably concerned with. That if they did not place Officer Husty on administrative leave, that this could get worse. And just by taking no action, having placed him on administrative leave and then bringing him back without a suspension or with no action, that concern doesn't dissipate within that time frame. This is too short a time frame for all of this to have gone away because the conversations were still happening. The focus on the police department was still happening. Counsel, the opposing counsel made the point that there is agreement and Officer Husty, in his supplemental statement, has emphasized that this was not a racial comment that he made. The terms druggie, thief, career criminal, those are not inherently racial terms. But in your briefing, you do emphasize the background, the context. This is a racially charged setting in the wake of what happened to George Floyd. I'm looking at the findings of the Cambridge Police Department. There's no explicit reference to concerns about the racial conflict undermining trust in the minority community. The findings talk about the suggestion that this comment would mean that the officer did not believe in rehabilitation and is disrespectful of people suffering from substance abuse disorder. Post can be interpreted that Cambridge police have a bias against people who have committed felony crimes or have a substance abuse disorder. There's nothing in that finding about undermining trust in the minority community. Is there anything in these findings that goes to that issue? No, Your Honor. The defendants have not argued that it would have undermined the trust in the minority community specifically. The references to the racially charged atmosphere is a reference to what was happening in the community that would have brought attention onto the Post and why it may have been made more popular because the subject was a popular subject at the time that the Post was made and the scrutiny that was on the police department at the time. But there is, I believe Officer Hustie said in his statement that there were no racial connotations. Dr. Bard certainly testified that he did not believe there were any racial connotations and as did Commissioner Elo. So what is the disruption that the Cambridge Police Department was concerned about? So as Dr. Bard had testified, the Cambridge Police had been for years making efforts to be known for restorative justice and not doing policing the same way policing had been done over decades. That they had been making these efforts to not simply put people in jail just because they were drug addicted individuals and to do more outreach towards the community. The bias is not towards any minority or any particular group other than drug addicted individuals, but also how the Cambridge Police talks about, thinks about, what their concerns are about the very constituents that they serve. If this is the kind of demeaning, dehumanizing as Dr. Bard put it, mocking, disparaging language that police officers are using to talk about their own constituents, then certainly the public would be right to be concerned about this police officer who's coming to help me, can I really trust them? Or when a Cambridge police officer is going to investigate a drug crime and needs the cooperation of a drug user to get information and as Officer Hussey testified, he spent a lot of his time in the 10 years he spent in the Special Investigations Unit convincing drug users to trust him, that he would protect them. So now that Officer Hussey, who is very visible in the community wearing a Cambridge Police uniform out in the community and particularly in Central Square, has made these comments, can those people still trust the next detective that needs their help and promises to help them if this is what they think of them? So those were the concerns of the police department, I think, were expressed in Dr. Bard's testimony, in the report itself done by PSU and in the suspension letter that Dr. Bard wrote to Officer Hussey. Then why is it so important that it was the NAACP that brought this post to the attention of the Cambridge Police Department? I drew from that concerns, a more specific concern about the impact of his comment on the minority community in Cambridge. That's not really, that's not part of what the department was concerned about? When the department first heard about it, they didn't know what to be concerned with because they hadn't seen it yet. But the argument isn't that because the NAACP came that they needed to be worried about the minority community. The argument about the NAACP is that's an organization that is in touch with the community in general. They have a lot of awareness of the community in general. So when they come and say we're concerned about bias, that's something that the department should listen to and should pay attention to and should investigate further, which is what they did. Okay. Thank you, counsel. Thank you. Okay. The counsel to the plaintiffs, you have two minutes for rebuttal. Please reintroduce yourself back on the record to begin. Thank you, Your Honor. Still Jack Bartholet for the plaintiff here. So I just want to touch on a few things really quickly, and I'm going to try to hit them all. The first is, you know, there was no reasonable prediction of disruption here. As Judge Howard pointed out, there was, at least for the second discipline, there was a two-month gap of absolutely no indicia of any sort of disruption. That was after, you know, the post had come to the attention of the NAACP and everybody else. Even in the first incidence, there was eight days. It was eight days between the post and his suspension.  Counsel, don't the cases tell us we're supposed to defer to the judgment of governmental agencies, particularly agencies involved in law enforcement, when they express a judgment that this could be really troublesome and problematic? Aren't the cases quite clear on that? This is not just some generalized concern about the effect on the public. This is a body who has particular responsibility to be concerned about what's going on in the community, and the cases say we're supposed to defer to their judgment. Well, not quite, Your Honor. There's a threshold inquiry before you defer, and that's, was the judgment reasonable? And here, there's a lot of indicia that it was. Well, doesn't deference play into that determination of whether it's reasonable? No, Your Honor. So in McCrae, this Court said, quote, and it's quoting other cases, the mere incantation of the phrase internal harmony in the workplace is not enough to carry the day. Sure, sure. Because the record must support allegations that the speech could disrupt operations. And in this way, then, mere speculation of disruption has never been enough. Rather, and in line with the Ninth Circuit's Mosher decision, we've explained that an employer's prediction of disruption must be reasonable based upon the record. So you have to look at the record to decide was this reasonable, not just defer to the agency. Waters talks a lot about this, the Waters case. And, you know, the Supreme Court also said that it needs to be much greater than mere speculation in the Doe case. And so unless Your Honors have any other comments, I just want to emphasize the perniciousness of if this is allowed, it would allow a whole host of reasonable predictions on many different topics. Okay. Thank you, Counsel. Thank you. The Court is adjourned until, I guess, tomorrow, 930 a.m.